UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MOLLY EHLERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:18-CV-01010 JAR |
| | ) |
| ANDREW SAUL,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Plaintiff Molly Ehlers's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* For the reasons set forth below, the Commissioner's decision will be affirmed.[2]

---

[1] Andrew Saul is now the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul should be substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Plaintiff expressed concern in her briefing regarding her lack of legal representation in this appeal and requests in her reply brief that the Court assign counsel. As the Court stated in its Order dated October 3, 2018, "There is no constitutional right or statutory right to appointed counsel in civil cases." *Phillips v. Jasper County Jail*, 437 F.3d 791, 794 (8th Cir. 2006). Here, Plaintiff competently raised her legal challenges to the ALJ's decision and properly briefed them for the Court's consideration. As stated previously, the issues in this social security case are not overly complex and the record medical evidence is limited in time and scope. Thus, to the extent Plaintiff requests appointment of counsel, that request will be denied.

## I. Background

On January 16, 2015, Plaintiff protectively filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* Plaintiff was 27 years old at the time of filing, and she alleged disability beginning May 17, 2014 through March 31, 2016, the date she was last insured.

The claim was initially denied on March 25, 2015. Thereafter, Plaintiff requested, and was granted, a hearing before an Administrative Law Judge ("ALJ"), which took place on December 9, 2016. On May 30, 2017, the ALJ issued a written decision upholding the denial of benefits. Plaintiff requested review of the ALJ's decision by the Appeals Council. On April 16, 2018, the Appeals Council denied her request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

## II. Decision of the ALJ

The ALJ determined that Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2016, and had not engaged in substantial gainful activity since May 17, 2014, the alleged onset date of disability. The ALJ found Plaintiff had the severe impairments of narcolepsy, bipolar disorder, and mood disorder, but that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Plaintiff also claimed disability due to anemia, polycystic ovarian syndrome, arthritis, scoliosis, and sickle cell anemia. The ALJ concluded that Plaintiff's anemia was not among Plaintiff's disabling impairments because a March 2015 examination reflects that Plaintiff reported that her anemia had corrected itself. Likewise, the ALJ concluded that there was no evidence in the record to suggest that Plaintiff was diagnosed with sickle cell anemia.

As to the polycystic ovarian syndrome, the ALJ noted that Plaintiff had not listed this condition among her disabling impairments in her application and failed to provide evidence that the condition imposes any work-related limitations. With regard to Plaintiff's arthritis and scoliosis, the ALJ concluded that there were no records from any medical professional diagnosing Plaintiff with these conditions, and the imaging of her knee and cervical spine were insufficient to establish a medically determinable impairment.

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work, except she was precluded from climbing ladders, ropes or scaffolds; she was unable to work around unprotected heights or dangerous machinery; she was precluded from driving automobile equipment and working around large bodies of water or open flames; she could perform simple, routine tasks involving no more than simple, short instructions and simple work related decisions with few workplace changes; she could engage in occasional and non-transactional interaction with the general public; and she could sustain concentration and attention for two-hour periods.

The ALJ found Plaintiff unable to perform any past relevant work; however, based on her age, education, work experience, and RFC, the ALJ determined there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including cleaner II, hand packager, and silver wrapper. Thus, the ALJ concluded that Plaintiff had not been under a disability from the alleged onset date of May 17, 2014 through March 31, 2016, the date last insured.

3

### III. Administrative Record[3]

The following is a summary of the relevant evidence before the ALJ.

#### A. Hearing Testimony

The ALJ held a hearing in this matter on December 9, 2016, in Mobile, Alabama, where Plaintiff was residing at the time. The ALJ heard testimony from Plaintiff and Gail E. Jarrell, an impartial vocational expert. Plaintiff was represented by counsel at the hearing.

#### 1. Plaintiff's testimony

Plaintiff testified at the hearing as follows. Plaintiff has an associate's degree and has held several different jobs. Most recently she was employed as a housekeeping supervisor with Marriott Hotels from 2011 to May 2014. In 2006 and 2007, Plaintiff worked in the floral department at Randall Foods and Drugs. In 2007, she also worked the register at Bucky's Ltd. Plaintiff was employed as a filing clerk at South Shore Medical Center between 2005 and 2007, and that employment was secured through her school.

Plaintiff began treating with James Hunter, M.D., for her narcolepsy after she and her family moved for her husband's job. Plaintiff's husband is a member of the military and is deployed for periods of time. Plaintiff initially had trouble with the medication—Adderall— prescribed for her narcolepsy. However, she eventually switched to Vyvanse, which has been treating her symptoms. Plaintiff discontinued Vyvanse between December 2015 and August 2016, while she was pregnant with twins (between December 2015 and August 2016). The twins were born prematurely, and Plaintiff suffered from postpartum depression.

---

[3] The Court's standing Case Management Order in social security cases requires the parties to file a statement of facts. The parties are not in compliance with that requirement. The Court notes that Plaintiff is representing herself and grants her some leeway. However, there is no excuse for the Commissioner's noncompliance. Future failure to comply with Case Management Orders may result in the Court issuing sanctions, including striking the Commissioner's answer to the claimant's brief.

4

Plaintiff relies heavily on her husband for assistance with housework and the children; it was her testimony that she did the "bare minimum" when she was home alone. When asked by the ALJ whether Plaintiff was the primary caregiver at home, she responded "I would say my husband is, more than I am." (Tr. at 13).

Since the twins were born, Plaintiff stated that her husband had been given special hours so that he was able to be at home more often. While her husband was at work, she drove her four-year-old son to school, where she was also a "room mother" at his classroom. Then, she took care of the twins, who were six months old on the day of the hearing.

Before the twins were born, Plaintiff's husband was deployed for weeks at a time, and Plaintiff, with the aid of a nanny, cared for her son, who was three years old at the time. The nanny would take care of the house and do the dishes and the laundry.

Plaintiff primarily experiences excessive daytime sleepiness and fatigue. She describes her condition as being "half asleep at all times." (Tr. 23). However, at night, she has trouble falling asleep and generally feels sad and depressed. Plaintiff would take naps when she was employed, and she stated "And back then, I didn't even realize that disability was an option, so I thought that I just had to do whatever I could do to make it work." (Tr. at 24-25). Plaintiff and her husband and children traveled to Texas in November 2016 to attend Plaintiff's high school reunion. Plaintiff is able to drive and has no physician-imposed driving restrictions.

**2. Testimony of Vocational Expert**

The ALJ asked vocational expert, Gail Elizabeth Jarrell, the following questions:

Q: All right. For hypothetical number one, let's assume an individual the claimant's age, education and vocational experience. The individual can perform medium work. Based on the diagnosis of narcolepsy, no climbing of ladders, ropes or scaffolds.

5

> No work around unprotected heights or dangerous machinery. No driving of automotive equipment. No work around large bodies of water or open flames. Can perform unskilled work, simple, routine tasks involving no more than simple, short instructions.
>
> And simple work related decisions with few workplace changes. Occasional and non-transactional interaction with the general public. Can sustain concentration and attention for two hour periods. Could the individual perform the claimant's past work?
>
> A: No, because the only job that was unskilled is with the public, retail cashier.
>
> Q: Is there other work in the national economy you can identify?
>
> A: Yes.

(Tr. 32). The vocational expert then went on to identify the jobs of agricultural worker, hand packager, and cleaner II. When the ALJ posed a second hypothetical leaving all previous limitations in place but adding limitations of the inability to sustain concentration and attention for two hour periods because of excessive sleeping due to narcolepsy symptoms, the vocational expert testified that the individual would be unemployable.

Upon examination by Plaintiff's counsel, counsel asked the vocational expert to assume the same limitations posed in the second hypothetical but add that the individual would be routinely late for work. The vocational expert responded that her opinion would be that the individual would not be able to maintain employment.

### B. Medical Records

The ALJ summarized Plaintiff's medical records in her decision. These and other pertinent records are discussed as part of the analysis.

### IV. Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Brantley v. Colvin*, 2013 WL 4007441, at *2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has

one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.*

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then she will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that she is disabled. *Brantley*, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.* "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Meyerpeter v. Astrue*, 902 F. Supp. 2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The Court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. *Pate–Fires v. Astrue*, 564 F.3d 935,

942 (8th Cir. 2009). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. *Andrews v. Colvin*, 791 F.3d 978, 983 (8th Cir. 2015); *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

>    (1) The findings of credibility made by the ALJ;
>    (2) The education, background, work history, and age of the claimant;
>    (3) The medical evidence given by the claimant's treating physicians;
>    (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>    (5) The corroboration by third parties of the claimant's physical impairment;
>    (6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and
>    (7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

## V.      Discussion

In her appeal of the Commissioner's decision, Plaintiff argues that the ALJ's decision regarding her RFC is not supported by substantial evidence in the record. Specifically, Plaintiff claims that the ALJ erred in finding that her severe impairments did not include anemia, polycystic ovarian syndrome ("PCOS"), postural orthostatic tachycardia syndrome, arthritis,

scoliosis, or cataplexy.[4] She also maintains that the ALJ's RFC determination is not supported by the medical evidence of record or the opinions of Plaintiff's treating physician, Dr. Hunter, or the consulting psychologist, Pamela Starkey, Psy.D.

1. The ALJ's Evaluation of Impairments

As previously stated, the Commissioner uses a five-step evaluation to determine if a claimant is disabled. 20 C.F.R. § 416.920(a)(4). Step two of the evaluation states that a claimant is not disabled if her impairments are not "severe." *Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007) (citing 20 C.F.R. § 416.920(a)(4)). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Id.* (citations omitted). If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007). It is the claimant's burden to establish that his impairment or combination of impairments are severe. *Kirby*, 500 F.3d at 708. Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and the Eighth Circuit has upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing. *Id.* (citing cases).

Here, Plaintiff did not meet her burden of proving that she has a severe impairment, or combination of impairments, resulting from anemia, PCOS, postural orthostatic tachycardia syndrome ("POTS"), arthritis, scoliosis, and cataplexy.[5] Plaintiff first claims she suffers from

---

[4] Cataplexy is a transient attack of extreme generalized muscular weakness, often precipitated by an emotional response, such as surprise, fear or anger. *McNeil v. Astrue*, No. 4:10 CV 2305 DDN, 2011 WL 2621705, at *1 (E.D. Mo. July 5, 2011) (citing *Stedman's Medical Dictionary*, 324 (28th ed.2006)).

[5] The Court notes that Plaintiff did not list any of these alleged impairments as medical conditions limiting her ability to work in her disability application. (Ex. 2E at 2).

10

the severe impairment of anemia. Plaintiff was treated for anemia in October 2014, and her physician directed her to take an iron supplement but noted that her lightheadedness was also caused by her narcolepsy medication. In March 2015, Plaintiff told Dr. Starkey that her anemia had corrected itself. Although Plaintiff argues that she has cyclical anemia[6] and that it has not resolved, there is no evidence in medical record indicating such an impairment.

Although the record reflects that Plaintiff had PCOS, there is no support in the medical record for Plaintiff's claim that irregular menstrual cycles and "hormone irregularities" would cause difficulties with understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, or adapting or managing herself. Moreover, there is nothing linking the condition to any limitations, and Plaintiff's own belief that PCOS plays "a huge role in [her] ability to function day-to-day and among society" is, by itself, insufficient to establish a disabling impairment. *See Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) ("an ALJ's finding must be supported by some medical evidence").

As to Plaintiff's alleged scoliosis and arthritis, the record contains only imaging results from a cervical spine MRI conducted on December 18, 2013 and imaging of Plaintiff's left knee. The results were unremarkable and insufficient to establish a medically determinable impairment without an evaluation by a medical professional. Although Plaintiff contends that she treated with a chiropractor, no such records were before the ALJ or this Court, and thus cannot be considered.

Plaintiff also argues that cataplexy should have been an additional impairment. Upon review of the ALJ's decision, it appears that the ALJ did not evaluate cataplexy as a condition

---

[6] The ALJ evaluated Plaintiff's claims of anemia and sickle cell anemia. With regard to sickle cell anemia, the ALJ concluded that there is no evidence to suggest that such a diagnosis exists. Plaintiff agrees and states that the treating physician may have misinterpreted Plaintiff saying "cyclical anemia" for "Sickle Cell Anemia." (Doc. No. 14 at 3).

11

separate and distinct from narcolepsy, but instead as a symptom occurring in conjunction with Plaintiff's narcolepsy.

Here, the medical records reflect no conclusive diagnosis of cataplexy. Dr. Hunter's records suggest that Plaintiff may have cataplexy, and his medical source statement reflects that Plaintiff's history of hypnagogic hallucinations and episodes are "almost certainly" cataplexy. (Ex. 20F at 1). However, it appears that the ALJ considered Plaintiff's cataplexy and its symptoms are part of her evaluation of Plaintiff's narcolepsy. Therefore, although not analyzed as a separate medical condition, the record reflects that the ALJ considered Plaintiff's cataplexy in making her determination that Plaintiff's narcolepsy was a severe impairment, and the record supports the ALJ's overall conclusion the condition was being managed with medication. *Brown v. Colvin*, 825 F.3d 936, 940 (8th Cir. 2016) ("The ALJ's failure to identify and analyze the appropriate listing, although error, may not by itself require reversal so long as the record otherwise supports the ALJ's overall conclusion.").

Lastly, Plaintiff in her brief asks if she "may be allowed to enter new record of [her] diagnosis of postural orthostatic tachycardia syndrome." (Doc. No. 14 at 4). It appears, although Plaintiff does not specifically state, that this diagnosis occurred after the ALJ entered her decision and is relevant to Plaintiff's complaints of fatigue and dizziness.

The Court may review evidence submitted after the ALJ issues her decision if it is new and material. *Bergmann v. Apfel*, 207 F.3d 1065, 1069 (8th Cir. 2000). "[T]o qualify as "material," the additional evidence must not merely detail after-acquired conditions or post-decision deterioration of a pre-existing condition." *Bergmann v. Apfel*, 207 F.3d 1065, 1069–70 (8th Cir. 2000). Here, Plaintiff does not direct the Court to any portion of the record addressing this diagnosis, nor does she submit additional medical records in support. Further, she does not

explain or provide any evidence of how the diagnosis would provide a basis for the Court to reverse the ALJ's decision. Thus, it will not be considered by the Court.

The Court concludes that the ALJ did not err when it determined that Plaintiff's anemia, arthritis, scoliosis, and PCOS were non-severe impairments. Further, the diagnosis of postural orthostatic tachycardia syndrome is not before the Court and does not qualify as new and material evidence. Thus, the Court will not reverse the ALJ's decision on that basis.

2. Medical Opinion Evidence

In her appeal of the Commissioner's decision, Plaintiff argues that the ALJ improperly evaluated the medical opinion evidence. Specifically, she argues the ALJ improperly assigned "no weight" to the opinion of treating physician Dr. Hunter and partial weight to psychological consultant Dr. Starkey. In determining whether the ALJ properly considered the medical opinion evidence, the Court's role is limited to reviewing whether substantial evidence supports this determination, and not deciding whether the evidence supports the claimant's view of the evidence. *See Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010); *Brown v. Colvin*, No. 4:13CV01693 SPM, 2014 WL 2894937, at *5 (E.D. Mo. June 26, 2014).

Generally, "[a] treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Reece v. Colvin*, 834 F.3d 904, 908–09 (8th Cir. 2016) (citation omitted). Although a treating physician's opinion is usually entitled to great weight, it "do[es] not automatically control, since the record must be evaluated as a whole." *Id.* at 909 (citation omitted). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent

opinions." *Id.* (quoting *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008)). "Whether the ALJ gives the opinion of a treating physician great or little weight, the ALJ must give good reasons for doing so." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)).

Here, Dr. Hunter provided two medical source statements with similar assessments of Plaintiff's condition. He opined that Plaintiff had all the manifestations of narcolepsy, including difficulty waking up in the morning and excessive daytime sleepiness, even with stimulant therapy. He noted that Plaintiff had a history of hypnagogic hallucinations and episodes, which are almost certainly cataplexy, where her muscles would go limp. Dr. Hunter concluded that Plaintiff was "totally and permanently disabled" and that Plaintiff was incapable of performing any work due to her difficulty in getting up consistently in the morning and her inability to stay awake at work. Dr. Hunter stated that although Plaintiff was improving on stimulant therapy, he had been unable to find an optimum dose due to the side effects of the medications.

The ALJ assigned no weight to Dr. Hunter's conclusory statement that Plaintiff was permanently disabled. This determination comports with controlling social security law. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (holding that a physician's opinion that a claimant is incapable of gainful employment is often not entitled to significant weight).

Upon review of Dr. Hunter's treatment records, it appears that although it took Plaintiff some time to find a medication and dosage that was effective in treating her narcolepsy symptoms, she reported in August 5, 2015, that Vyvanse and Imipramine had been helpful and that she planned to go back to school in the spring. *Hensley v. Colvin*, 829 F.3d 926, 933–34 (8th Cir. 2016) ("If an impairment can be controlled by treatment or medication, it cannot be

considered disabling."). Further, Plaintiff did not seek treatment for her narcolepsy while pregnant, and she even discontinued taking her medications during that period, reporting to Dr. Hunter that she was feeling "fine" without it. Thus, Dr. Hunter's statement that he had been unable to identify an optimum dose to control Plaintiff's narcolepsy is inconsistent with his more recent treatment notes. *See Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015) ("A treating physician's own inconsistency may undermine his opinion and diminish or eliminate the weight given his opinions.").

On March 13, 2015, Pamela Starkey, Psy.D., performed a mental examination of Plaintiff. Dr. Starkey noted Plaintiff's failure to dress herself unless necessary, showering once or twice per week, and occasionally washing dishes and doing laundry. Dr. Starkey diagnosed Plaintiff with major depressive disorder and generalized anxiety disorder, with a prognosis for a favorable response to treatment as fair, but more difficult due to Plaintiff's reported narcolepsy and hypersomnia. Dr. Starkey then determined that Plaintiff's functional capacity to be a follows: (1) ability to understand simple, concrete instructions appeared adequate; (2) ability to remember and carry out simple, concrete instructions appeared mild to moderately impaired; (3) ability to respond appropriately to supervision appeared adequate; (4) ability to respond appropriately to coworkers appeared adequate; and (5) ability to manage common work pressures appears significantly impaired. (Ex. 15F).

The ALJ gave partial weight to the assessment of Dr. Starkey that Plaintiff had an adequate ability to understand simple, concrete instructions; is mild to moderately impaired in remembering and carrying out simple concrete instructions; and can respond appropriately to supervisors and co-workers. The ALJ determined that these conclusions were consistent with the results of the ALJ's own in-person examination of Plaintiff.

However, the ALJ gave no weight to Dr. Starkey's assessment that Plaintiff was significantly impaired in managing common work pressures. The ALJ reasoned that Plaintiff was able to undergo stressful fertility treatments and was the primary caregiver for her three children. Thus, the ALJ concluded Plaintiff's activities of daily living demonstrate that she is capable of managing common workplace pressures.

Dr. Starkey is a one-time evaluating psychologist. In contrast to a treating physician, "[a] one-time evaluation by a non-treating psychologist is not entitled to controlling weight." *McJames v. Barnhart*, 365 F. Supp. 2d 1018, 1031 (E.D. Mo. 2005) (quoting *Clark v. Apfel*, 141 F.3d 1253, 1256 (8th Cir. 1998). A consulting physician's evaluation must be evaluated in light of the other evidence in the record. *See Clark v. Apfel*, 141 F.3d 1253, 1256 (8th Cir. 1998) (holding that IQ scores were properly disregarded where they resulted from one-time assessment of non-treating psychologist and were inconsistent with claimant's daily activities, and other medical records made no mention of intellectual impairment).

Upon review of the record, the Court concludes that the ALJ did not err in the weight assigned to Dr. Starkey's assessment. It appears that Dr. Starkey's assessment was largely based on Plaintiff's subjective complaints, which are inconsistent with Plaintiff's activities of daily living. Further, Dr. Starkey's assessment took place in 2015, before Plaintiff had the twins. More recent records from October 2016 demonstrate that Plaintiff has been caring for three young children by herself while her husband is deployed for weeks at a time. Plaintiff took on the role of room mother in her son's class and was involved in organizing a Halloween event for the coast guard unit families. Further, Plaintiff reported taking better care of herself, including hygiene, and attending her high school reunion in Texas. This supports the ALJ's assignment of partial weight to Dr. Starkey's assessment of Plaintiff's functional limitations.

3. Plaintiff's Credibility

Plaintiff argues the ALJ erred in her credibility evaluation and RFC determination by finding that Plaintiff's activities of daily living were inconsistent with her claims of disability. Deference is given to the ALJ's conclusion with regard to credibility determinations. *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009).

In evaluating a claimant's credibility, the ALJ should consider the claimant's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984). The ALJ may discount subjective complaints if there are inconsistencies in the record as a whole. *Choate v. Barnhart*, 457 F.3d 865, 871 (8th Cir. 2006) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. *Id.* The Court will uphold an ALJ's credibility findings, so long as they are adequately explained and supported. *Ellis*, 392 F.3d at 996.

The ALJ opined that in spite of Plaintiff's narcolepsy, she had a driver's license, was able to drive, and had not been restricted from driving by any physician. The ALJ noted that in June 2015, Plaintiff reported feeling "fine" after being taken off Imipramine, and in August 2016, Plaintiff reported that her narcolepsy was "fine" when she went off the medication during her pregnancy. The ALJ also relied on treatment notes from August 2015, which reflected Plaintiff's narcolepsy medications were helpful and that Plaintiff intended to go back to school in the spring.

With regard to Plaintiff's mental impairments, the ALJ determined that Plaintiff's condition was responsive to medication and improved over time. *See Renstrom v. Astrue*, 680

17

F.3d 1057, 1066 (8th Cir. 2012) (conditions which can be controlled by treatment are not disabling). Further, the ALJ noted that Plaintiff stated in July 2015 that she would only agree to commence therapy if it would help her get disability benefits. The ALJ relied on a treatment note from November 2016, in which Plaintiff indicated she was feeling positive; that her expression was not affecting her negatively; and that she was trying to be more socially active and take better care of her personal hygiene. Thus, the ALJ determined that in comparing the objective medical evidence to Plaintiff's subjective complaints, Plaintiff was more capable than alleged. The ALJ concluded that Plaintiff "is able to care for her children, manage stressful situations, and perform a wide range of activities of daily living."

Plaintiff contends that the ALJ's evaluation of her current situation is inaccurate and refuted by the record. Plaintiff argues that her husband, not Plaintiff, is the primary caregiver in the family and maintains that she does the bare minimum to survive and care for her children. She describes a home life in which her husband works full time, takes care of the children, manages all household duties, including cooking, cleaning, and laundry, and helps Plaintiff with her medications. She describes her role as caregiver as laying on the couch, feeding her children, and changing their diapers. She claims that "Things have not been easy. We have been struggling for so long just hoping for a little light at the end of the tunnel." (Doc. No. 19 at 6).

The Court, upon careful review of the record, finds that the evidence in this case supports the ALJ's credibility determination. Although Plaintiff claims that she is merely surviving, the Court finds her description of daily life difficult to reconcile in light of the undisputed evidence that Plaintiff is at times the sole caregiver for her three young children while her husband is deployed, whether for one week or several weeks at a time. *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009) (subjective complaints of disabling physical and mental limitations were

18

inconsistent with claimant's daily activities as primary caregiver for two special-needs children and doing household chores); *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (no error in discounting credibility where self-reported limitations were inconsistent with medical evidence and daily activities, including housework, caring for child, cooking and driving).

Further, it appears that Plaintiff's social activities are increasing, her narcolepsy is controlled by medication, and her mental health issues are either responding to medication or have resolved for the time being. In fact, Plaintiff declined attending therapy to treat her mental health concerns. *See Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011) (holding that the failure to seek mental treatment is a relevant consideration when evaluating a claimant's mental impairment). Plaintiff was able to be a room mother at her son's school, she participated in organizing a Halloween event, and she attended a high school reunion. Moreover, there is no evidence in the record that Plaintiff has been restricted from any activity, such as driving or working, by a physician. *Cf. Bailey v. Astrue*, No. C11-0005, 2012 WL 135588, at *13 (N.D. Iowa Jan. 17, 2012) (reversing the ALJ's denial of benefits in part because the claimant, who was diagnosed with narcolepsy, was restricted by her physician from working more than 4 hours in a regular workday). This demonstrates to the Court the ability to perform a level of activity above that described by Plaintiff.

Thus, although the Court acknowledges that Plaintiff may well be experiencing difficult circumstances at home, the record supports the ALJ's determination that Plaintiff's statements regarding the persistence, intensity, and limiting effects of her medical conditions is not entirely consistent with the medical evidence and other evidence in the record.

## VI. Conclusion

For the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence contained in the record as a whole, and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate judgment will accompany this Order.

Dated this 16th day of September, 2016.

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE